## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Jane Doe,

Plaintiff,

v.

WILLIAM P. BARR,
In his Official Capacity as U.S. Attorney General,
Department of Justice, Federal Bureau of
Investigation, Agency,
950 Pennsylvania Avenue, NW
Washington, DC 20530


and John Smith, Individually and in his Official
Capacity at the Federal Bureau of Investigation,


Defendants.

Civil Action File No.: 1:20-cv-03553-TNM

**<u>JURY TRIAL DEMANDED</u>**

## <u>FIRST AMENDED COMPLAINT FOR DAMAGES</u>

COMES NOW Jane Doe, by and through counsel, and files her first amended complaint

against Defendant William P. Barr, in his official capacity as Attorney General of the United

States, Department of Justice, Federal Bureau of Investigation, for race, sex, religion, national

origin discrimination and sexual harassment under Title VII. This action is also brought against

John Smith, under pseudonym, individually, and in his former official capacity as a Special

Agent in Charge of the Federal Bureau of Investigation, and respectfully shows to the Court as

follows:

## NATURE OF THE ACTION

1.  This action is being brought against Defendant William Barr (hereinafter referred to as "Defendant Barr"), in his official capacity as head of the Department of Justice, Federal Bureau of Investigation, Agency, under Title VII of the Civil Rights Act of 1964, as amended, for discrimination, harassment, and retaliation on the basis of sex, gender, national origin, ethnicity, and religion. This action is also brought against Defendant John Smith (hereinafter referred to as "Defendant Smith"), in his official capacity, *under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for violation of the Federal Constitution by a federal officer; for sexual assault, deprivation of rights under the Fourth and Fifth Amendments and against Defendant Smith, in his individual capacity, for race and national origin discrimination under Section 1981 of the Civil Rights Act of 1866, and individually, for personal injury claims for sexual assault, battery, invasion of privacy, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and interference with contractual relationship.

## JURISDICTION AND VENUE

2.  Jurisdiction is proper in this court because District Courts have original jurisdiction over Title VII, Section 1981, and *Bivens* claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3) because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights. Jurisdiction is also provided by the doctrine of pendent party jurisdiction over Defendant Smith.

3.  Venue is proper in this judicial district under 28 U.S.C. § §1391(b)-(c) and 42 U.S.C. § 2000e5(f)(3) because Defendant Barr is located in this District, and some of the events were directed by personnel in this district. Venue is proper against Defendant Smith under 28 U.S.C.

§1391(e) while acting in his official capacity and under 28 U.S.C. §1391(b) in his individual

capacity and under the doctrine of pendent party venue.

## ADMINISTRATIVE PROCEDURE

4.   Jane Doe (hereinafter referred to as "Plaintiff") made two timely EEO complaints. She

has exhausted her administrative remedies in both cases prior to bringing this suit. In her first

complaint, she filed timely charges of discrimination, more than 180 days have passed since the

appeal was made to the EEOC, and the EEOC has made no final determination of the claims. In

her second complaint, she filed timely charges of discrimination with the FBI, more than 180

days have passed since the filing of the complaint, and no final decision has been made by the

Agency and more than 180 days have passed without a determination being made by the EEOC.

## EQUITABLE TOLLING AND ESTOPPEL

5.   A statute of limitations is tolled based on the continuing violations doctrine, equitable

estoppel, and equitable tolling, due to the duress and threats to Plaintiff by Defendant Smith if

she told anyone about what happened and threatened the Plaintiff if she were to complain.

Because Defendant Smith held Plaintiff captive and threatened her life, his life, and harm to her

family, if she was to speak about the sexual assaults he committed against her, Plaintiff was not

able to bring the claims presented until this time. Because Defendant Smith has as recently as

June 2020 reached out to family members of Plaintiff related to her, Plaintiff, through her

counsel, sent a cease and desist to stop communication and he continued to reply with threats if

she spoke of these events in July of 2020. It is only after obtaining the undersigned counsel that

she was able to come forth under the protection of anonymity.

6.   The type of emotional and physical abuse Defendant Smith used to command silence

from Plaintiff and cover up his assaults has been studied by psychologists. Psychologists John

Gottman and Neil Jacobsen, authors of <u>When Men Batter Women</u> (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from systematic abuse at the hands of a partner. The four factors that determine emotional violence, Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage. Each of these factors can be found in Defendant Smith's abuse of Plaintiff.

7.   The statute of limitations was thus tolled at least until the Plaintiff was able to finally disclose the abuse and victimization she faced by Defendant Smith, which was in her EEO Signed Sworn Statement issued August 7, 2020.

## PARTIES

8.    Jane Doe is a female in a very conservative religious culture. She is a resident of the State of (redacted), and a former employee of the Federal Bureau of Investigation.

9.   Defendant Barr is the Attorney General of the United States of America. Defendant Barr is named in his official capacity as the Attorney General, and as such is the head of the Federal Bureau of Investigation.

10. Defendant Barr may be served with process at 950 Pennsylvania Avenue, NW, Washington, DC 20530.

11. Defendant Smith served as the Special Agent in Charge, the highest-ranking agent in a field office with the Federal Bureau of Investigation, and is a resident of the State of (redacted). Defendant Smith is being named in his individual and official capacity.

12. In doing the acts alleged herein, unless done so in his individual capacity, Defendant Smith acted within the course and scope of his employment for the Federal Bureau of

Investigation. As to some acts alleged in this Complaint, Defendant Smith was acting in his individual capacity.

13. In doing the acts alleged herein, unless done so in his individual capacity, Defendant Smith acted under color of authority and/or color of law.

14. Defendant Smith may be served with process at (redacted).

## OPERATIVE FACTS

15. Plaintiff entered duty with the Federal Bureau of Investigation (FBI) in October 2011 as a direct-hire after being recruited into the position from her former job.

16. In the process of applying and being hired to the FBI, Plaintiff submitted information related to her background and finances. She submitted to and passed a polygraph test before and after entering duty with the FBI and as part of her onboarding process. She also granted the FBI access to her financial records and referenced items in her Personal Security Interview pre-employment including a distressed sale of property that her ex-husband had brokered. Plaintiff was not directly involved in the distressed sale.

17. After entering duty with the FBI in October 2011, Plaintiff was forced to engage in EEO-protected activity almost immediately. After being hired, Plaintiff's personal property was displayed in a secured floor of the FBI field office. Her gender, ethnicity, and religion were recognizable from her display.

18. Shortly after the new employees' personal property were displayed, an unknown FBI employee scratched an X mark on Plaintiff's personal property. The other new employees' property was not damaged.

19. Plaintiff filed an EEO complaint outlining the discrimination based on her race, ethnicity, and religion after the property defacement. However, instead of the person responsible for the

action being identified, Plaintiff was subjected to increased scrutiny than white, male, and non-ethnic minority peers. For example, in 2012, Plaintiff was placed on a Post Adjudication Risk Management (PARM) Program due to her connections in an ethnic minority community. No other FBI employee was placed on a PARM, including a white male colleague who had family overseas. In 2013, Plaintiff was required to take another polygraph test without any new information being sighted. She passed that polygraph test.

20. Ultimately, Plaintiff abandoned her EEO complaints from 2011 and 2015 in fear of further retaliation by the FBI and Defendant Smith and further abuse by Defendant Smith as well as physical and mental threats made by Defendant Smith about her engaging in the EEO process.

21.  Plaintiff first met Defendant Smith around September 2012 when he arrived at the FBI Field Office as the Special Agent in Charge (SAC). He was the top FBI executive in the state.

22. Prior to serving as the SAC in the Field Office where Plaintiff worked, Defendant Smith was previously the SAC at another Field Office as well as the Section Chief for the Human Resource Division of the FBI. It was through his position as Section Chief of HR that he controlled the promotion and movement of people within the Agency. He made sure to tell Plaintiff over and over about his work in HR, the control he had in that job, and the connections he continued to hold within FBI Headquarters.

23.  In or around December 2012, Plaintiff was going through the religious portion of the divorce with her husband. The divorce was legalized in May 2013.

24. Plaintiff later learned that during her divorce proceedings that Defendant Smith met with her divorce attorney without her knowledge or consent. He represented to her attorney that he was also an attorney and guided the divorce settlement, even though it was to Plaintiff's

detriment. Ultimately, he did these things because he wanted to assert control over the outcome of the divorce.

25. In November 2012, Defendant Smith began to single out Plaintiff by calling her into his office and demanding Plaintiff attend certain meetings with him. These meetings would often last over 1.5 hours and if Plaintiff would try to bring in a male colleague because culturally it was not appropriate to be in a closed room with a male, Defendant Smith would require the male colleague to leave. While he understood these interactions made Plaintiff very uncomfortable, Defendant Smith continued to subject her to long, one-on-one, closed-door meetings.

26. In November 2012, Defendant Smith first touched Plaintiff without her consent, trying to hold her hand and put his arm around her neck. Because of her religious practice, Plaintiff did not touch or hug men outside of her immediate family. As the highest ranking official in the FBI field office, Plaintiff was unsure how to counter his actions given his position and power.

27. At the end of December 2012, Defendant Smith instructed Plaintiff that she needed to disclose to him everything related to her personal life after Plaintiff's ex-husband had a mental health outburst resulting in law enforcement being called to her home. He said it was FBI policy for Plaintiff to disclose this information as the head special agent of the field office. Instead of gathering information to protect his employee, he used the information to blackmail, control, manipulate, imprison, and ultimately report her to the FBI's Office of Inspector General (OIG) to have her removed from the roles of the FBI to gain her complete control and submission knowing she would be left with no financial income to raise her minor children.

28. In February 2013, Defendant Smith falsely relayed to Plaintiff that her former employer had issued a formal complaint about her and that her job with the FBI could be in jeopardy. Defendant Smith ordered her to never follow-up about the alleged complaint to anyone. While

Defendant Smith never produced a copy of that complaint, he created the false and fraudulent story to induce Plaintiff into submission.

29.  In or around February 2013, Defendant Smith told Plaintiff that he needed Plaintiff's work phone and personal phone for the FBI. He asked for the passwords to Plaintiff's phones, which she provided to him because he was the SAC whose orders she had to obey. After this, he would ask Plaintiff for her personal phone during work hours and take it to his office. Defendant Smith downloaded access to her phone, without Plaintiff's consent, so that he could stalk and spy on her and acquire information or photos of Plaintiff that he could use as blackmail.

30. Defendant Smith later admitted to the FBI OIG that he had used her phone to track her and follow her whereabouts without Plaintiff's knowledge. The FBI and OIG took no action with regard to these violations of federal and state law and proceeded to cover them up.

31. After Defendant Smith took access of Plaintiff's phone, he would follow her, stalk her, invade her privacy on a daily basis, and show up at locations that she was at without her prior knowledge.

32. In April 2013, Plaintiff attended an event with Defendant Smith as part of her role with the FBI. They rode in the same vehicle, and on the way back to the area of the field office, he informed Plaintiff, who was the passenger, that he wanted to show her a park. He drove to a park and parked the car. While the car was parked, Defendant Smith rolled on top of Plaintiff in the passenger seat and began to try to kiss her. Defendant Smith leaned the car seat back forcing himself on top of Plaintiff and wrapped his arms around her. He had a deadly weapon on him and weighed 80 pounds more than she did. Plaintiff was in fear of her safety and life. Plaintiff pushed him off her body and asked him to stop. She cried the entire ride home.

33. The next day at the FBI Field Office, Defendant Smith was offended by Plaintiff refusing to allow him on top of her to make sexual contact and advances against her. Defendant Smith called her into a meeting causing fear and distress to Plaintiff due to Defendant Smith being highly influential and uniquely situated to exercise coercive power over her. Plaintiff believed that if she did not comply with what Defendant Smith wanted that he would take actions against her that would jeopardize her livelihood, health, and overall wellbeing.

34. In or around April 2013, Defendant Smith falsely imprisoned Plaintiff when he forced Plaintiff to move out of her home and move in with a family member where she lived in a confined space that was a storage area with her minor children. Defendant Smith asserted to Plaintiff that she could not ask questions, that he knew what he was doing, and that she had to trust him.

35. After forcing Plaintiff into the confined storage area to live with her children, one evening around 10 p.m., Defendant Smith arrived where Plaintiff lived unannounced in his FBI issued car with the lights on. He called Plaintiff and told her that she had to come out and talk to him otherwise he would start talking on the loudspeaker. Plaintiff was alarmed because she lived in a very conservative religious neighborhood and did not want to cause alarm to her neighbors. She went outside and got in his car where he drove to an empty parking lot about a half block away. He got out of the car and demanded that they talk outside. Plaintiff asked him why they needed to speak outside since they were in a very conservative religious neighborhood late at night. Defendant Smith told Plaintiff that he had nearly died getting to her because he had driven over 110 mph with his lights and siren on to get from his house to where she lived. Defendant Smith asserted that he believed Plaintiff was reconciling with her ex-husband because he had tracked her phone and saw that she was at her family home earlier that evening where Plaintiff's

Case 1:20-cv-03553-TNM   Document 3   Filed 12/09/20   Page 10 of 30


ex-husband still resided. Plaintiff told Defendant Smith that she had gone to the home to get clothes for her children because the unsuitable apartment he forced her to live in did not have room for them to keep all of their belongings. He then pulled up his phone and had Plaintiff's ex-husband's number displayed. Plaintiff had never provided this phone number to Defendant Smith. He told Plaintiff that he obtained his number because he was in the FBI and he had his ways. Defendant Smith then told Plaintiff that she was never allowed to go over to the family house again and threatened Plaintiff by saying he was going to call her ex-husband and tell him that Defendant Smith and Plaintiff were having an affair. Defendant Smith had made comments to Plaintiff in the past that because she was an ethnic minority woman in a conservative religious culture, he had more control over her. In this case, he knew that if Plaintiff's community and ex-husband were to think that she was having a relationship out of marriage, that Plaintiff could be subjected to endangerment for the alleged transgressions, her children being taken away from her permanently, or other major consequences that would affect her life. Plaintiff asked him not to make the call and Defendant Smith told Plaintiff she would have to beg him to not make the call. He forced Plaintiff on her knees and told her to beg him not to call. Defendant Smith then made a fake call (unknown to Plaintiff that he was not actually making the call) pretending to talk to Plaintiff's ex-husband stating that he was having an affair with the Plaintiff. He did so to assert control over Plaintiff and Plaintiff told him that she would do anything he asked as long as he did not do something that could result in her children being removed from her custody. It was at this time that Plaintiff believed that Defendant Smith would stop at nothing to have total control over her and that if she wanted to keep her and her family safe she must comply with whatever Defendant Smith said.

36. In or around May 2013, Defendant Smith told Plaintiff that he had converted religions and was being retaliated against in the FBI for his conversion and sought her support. That month, Defendant Smith and Plaintiff met at a park sitting in Plaintiff's car. Defendant Smith would often request that Plaintiff meet him at different places so that he could talk to her. Because of her fear of what would happen if she did not comply with him, Plaintiff would meet him as he requested. On this evening, Defendant Smith got on top of Plaintiff aggressively, trying to put one of his hands down her pants. He touched her breast and body over her clothes. Plaintiff immediately removed herself from under him and got out of the car. She later called him to tell him that he had acted inappropriately. Again, she cried and cried after this sexual assault and battery.

37. In June 2013, he once again tried to solicit unwelcomed physical and sexual conduct during the lunch hour while working at the FBI. That day, he tried to start kissing her and touching private areas of her body. This time, she got out of the car and left work to go to a friend's house because of the fear and trauma she had just endured. Plaintiff could not go back to work that day, due to the trauma of the assault. She experienced another day of crying and emotional distress.

38. At the same time, by June 2013, Plaintiff believed that she must begin to accept feelings for Defendant Smith. As a devote member of a conservative religious group, Plaintiff does not date, and the actions that Defendant Smith took against Plaintiff made her feel incredibly uncomfortable, isolated, silenced, and compromised.

39. Defendant Smith in his surveillance of Plaintiff's phone downloaded compromising pictures of her to blackmail her into further submission. He threatened her with exposing pictures he took from her phone where her body was exposed and continued to threaten to tell members

of Plaintiff's family and her ex-husband that he was involved in a relationship with her.

Defendant Smith threatened to kill himself and told Plaintiff that his daughter was dying, which

she was not, to further manipulate and control Plaintiff, ultimately making her submit to a

marriage proposal. He told Plaintiff that she must change her clothing style so that it complied

with the most conservative version promoted in her religious practice.

40. In July 2013, Defendant Smith inflicted another sexual assault and battery by coercion

against Plaintiff which placed her at severe risk for irreparable harm.

41. On July 12, 2013, Defendant Smith communicated with Acting Special Agent in Charge

of the White-Collar Crime Unit (ASAC) and referred Plaintiff and her ex-husband to an OIG

investigation. Defendant Smith had calls with the ASAC and Inspection Department Chief prior

to submitting the OIG referral to get opinions on how to submit the referral. Defendant Smith

made this referral to increase his control over Plaintiff, because if Plaintiff were fired from the

FBI, she would be, in Defendant Smith's eyes, dependent on him and Plaintiff would have to

marry him.

42. Because of Defendant Smith's prior position as Section Chief of HR, which oversees

both the OIG and the Disciplinary Review Board (DRB), he used that position and power to

further manipulate and control Plaintiff and elevate his baseless investigation against Plaintiff.

43. Between July and September 2013, Defendant Smith was preparing to step down and

move to another state to serve as a Special Agent in the FBI field office. When he moved at the

end of September, Plaintiff still felt that she still had to move forward with his wishes to marry

her. Plaintiff was afraid of what he would do when he left that could jeopardize her and her

family. Defendant Smith maintained many phone numbers that he would use to call Plaintiff.

Even when she tried to block his number, he would call from many different numbers making

Plaintiff have to answer (her job was to be on call and answer phones from the community). He would call and text her hundreds of times in a single day, incessantly harassing Plaintiff.

44. At this point, Defendant Smith had asserted complete manipulation and control over the Plaintiff. Plaintiff believed as part of her conservative religious principles that she had to go along with whatever Defendant Smith had said because he had sexually assaulted her and if this type of information was known in her community she could be subjected to endangerment or have her daughter suffer harm as well. While Plaintiff felt trapped in her circumstances, she continued to beg Defendant Smith to release her. This meant that he would safely relinquish control over her so as not to cause harm to herself or her family. Ultimately, with the goal that he would leave her alone.

45. In October 2013, Defendant Smith returned to the area that Plaintiff lived. He wanted to meet with Plaintiff with that visit, adding this request as a requirement to "release her". Defendant Smith would not accept Plaintiff telling him that she did not want to have any form of relationship with him and she wanted him to leave her alone. Instead, he continued to threaten Plaintiff with exposing compromising photos of her he took from her phone without her permission, talking to her ex-husband or community to result in her children being removed from her, and inciting investigations against the Plaintiff. If Plaintiff was to be safely released from his control, Defendant Smith required Plaintiff to fulfill certain conditions, which he would continually change, keeping her stuck in his control. During this visit, he requested Plaintiff meet him at his hotel. He once again sexually assaulted her by coercion.

46. While Defendant Smith was living in another state and no longer in her chain of command, or acting in his official capacity as SAC, he continued to stalk and place surveillance on Plaintiff. He would require Plaintiff to send him proof of Plaintiff canceling or declining

invitations to events that were necessary for her role in the FBI, including conferences she was invited to speak at by FBI HQ. Defendant Smith ordered her to cancel her attendance in writing and forward the cancellation to him for proof.

47. Defendant Smith would also require that she show proof of every time that she left her home and each place that she went. For example, if she were at her home and wanted to visit her mother, he would require her as part of her permission to leave the home to take a picture of her home, with the time, when she left. She would then have to take a picture of her mother's home when she arrived. She would have to show that there was only enough gap in time for her to travel, making no other stops. When she would leave her mother's home she would once again have to take a picture of her mother's home with the time and take a picture of her house once she returned home documenting the commute. Defendant Smith forced her to do this each and every time she left her home over the span of years.

48. Beginning in May or June of 2014, Defendant Smith would make Plaintiff keep her phone on speaker so he could listen in on her as she carried out her day. While Plaintiff was at home, he would listen in for hours while she went about her daily activities including helping her children with homework and completing housework. He also did this when she was driving and wanted Plaintiff to keep him on speaker while she attended events for her job. If she didn't place her phone on speaker at events, Defendant Smith would call the location and ask to speak to her. Defendant Smith continued to reach out to her and expand the requirements for her safe release. For example, in November 2014, he told her that he needed Plaintiff and that if he didn't have her, he could hurt Plaintiff or himself.

49. While Defendant Smith was living in another state, he continued to stalk Plaintiff and keep surveillance on her. For example, one day she planned to meet with a former FBI colleague

for lunch. On her way there she received a phone call from Defendant Smith asking why she was going to lunch with her co-worker. This was not information that Plaintiff had shared with Defendant Smith and this scared her that he was tracking everything that she was doing. She had to pull off the road and vomit from the emotional distress this caused her. She ended up canceling the lunch, only years later being able to tell her co-worker why she was forced to cancel at the last minute.

50. In December 2014, Defendant Smith told Plaintiff that he needed her to come where he lived while he took the Bar Exam to become a licensed attorney in his state. He told Plaintiff that if she supported him through the bar exam, he would release her. Plaintiff did go in hopes that if she did, he would finally release her. However, Defendant Smith continued to tell Plaintiff that he would commit suicide, that his daughter was dying, and that he was in a bad place in his career because he had tried to help her. During this visit, he sexually assaulted Plaintiff by coercion.

51. In 2014 and 2015, while in another state, Defendant Smith continued to email, call, text, and reach out to Plaintiff's family and friends from multiple emails and phone numbers. He sent hundreds of emails from multiple email addresses including an FBI email address and later an email address connected to his law practice, as well as other personal emails. While in the FBI, Defendant Smith even set up an email based on a law firm under his name. This was while he was still an active Special Agent with the FBI. FBI employees are prohibited from the private practice of law while employed at the FBI. Plaintiff is informed, and believes, that Defendant Smith did not get permission for outside employment prior to setting up his law firm while in the FBI.

52. In either November/December 2014 or February 2015, Plaintiff was told by Defendant Smith that he needed her to come to where he lived for an in-person conversation about "critical topics". At that point, she wanted to be released from his control and relationship, so Plaintiff complied and went to him hoping that Defendant Smith would release her and finally leave her alone. When she arrived, she did not leave the airport, rather stayed at the Marriott located in the airport. However, after her arrival, there was nothing Defendant Smith shared "in-person" that he could not have shared by phone. Plaintiff attempted to leave the Marriott and return home earlier than her scheduled flight. However, Defendant Smith aggressively continued to grab her phone from her hands and scold her in front of the public. Plaintiff was mortified and publicly crying. Unfortunately, Plaintiff's multiple attempts to secure an earlier flight home were unsuccessful. However, either a Delta Representative or a Marriott Representative called the police department to report abuse and to report that a potential human trafficking victim was being exploited causing two police officers to arrive at the scene. The dispatch call was for an "alleged human trafficking victim". Defendant Smith and Plaintiff were separated and questioned by police. Defendant Smith informed the police officer that he was a Special Agent with the FBI causing the police officers to leave and stop any further investigation of the issue. Defendant Smith told Plaintiff not to report the incident to the security division of the FBI and was worried he had to use his badge to resolve the incident.

53. Throughout all of the in-person interactions, as alleged herein, and at other times in general, Defendant Smith wore a gun on his person. Plaintiff feared for her safety and was terrified by his use of weapons to further control her.

54. In the beginning of October 2015, Defendant Smith was calling Plaintiff non-stop and insisting that she speak with him. When she finally answered, he said that as a condition of her

release he wanted her to meet with him again. She refused to see him and had friends join a phone call with her where they told Defendant Smith to release her and that the relationship was over. After that call, she changed her phone number yet again, but he would continue to find her number and call her.

55. In 2016, prior to Plaintiff's 4th interview with OIG, for the investigation brought by Defendant Smith against her, he reached out to Plaintiff's friend to relay to Plaintiff that he was suicidal and circling the drain and was afraid that Plaintiff would expose him and what he had done to OIG. She feared for her safety and while she tried to communicate to the OIG about the fears he had instilled in her, the OIG instead recommended she be removed from the FBI for a lack of candor, while the investigation was put off for 3 years until Defendant Smith could retire with a pension. All allegations of mortgage fraud were ultimately found baseless.

56. Defendant Smith's continuous manipulation resulted in non-consensual sexual encounters, control, assault, imprisonment, stalking, and harassment that continued in person until 2013 when Defendant Smith was reassigned to another state and continued through 2015 and beyond by him continuing to track, stalk, call, and email incessantly, and threaten Plaintiff.

57. In June 2020, Defendant Smith reached out to Plaintiff's religious leader and family members trying to make further contact with her.

58. Due to Defendant Smith's obsession with Plaintiff and in an attempt to harass and have control over her, he referred Plaintiff to the Inspection Division on July 12, 2013, which resulted in a criminal investigation by the Office Inspector General (OIG). The entire investigation was manufactured, lacked merit, and overall was part of Defendant Smith's gender-motivated violence and harassment against Plaintiff.

59. Defendant Smith's friend in the field office, a person that he had promoted, an Assistant Special Agent in Charge (ASAC), helped push the fraudulent allegations through to the OIG. This incited an investigation against her that lacked merit and was only made as a way for Defendant Smith to assert additional control over her and avoid the consequences of a sexual relationship with a subordinate, which was in violation of the FBI's sexual harassment policy.

60. Although the allegations regarding fraud and theft surrounding the distressed sale were invalid, as corroborated by the US Attorney's Office declining to prosecute her and the Disciplinary Review Board (DRB) failing to uphold the results of the biased OIG's investigation, there was a finding that Plaintiff lacked candor under oath regarding the relationship with Defendant Smith. As a result of the invalid finding for a lack of candor, she was terminated on September 18, 2018.

61. Defendant Smith had threatened to kill Plaintiff and himself if she talked about what happened, and he ordered her to say that it was mutual and consensual, had started as a friendship before it became personal, and then consensual. At the time of the interview, the OIG investigator identified her as a victim of Defendant Smith, however, the investigators then determined she lacked candor related to her relationship with Defendant Smith, and she was removed from the roles of the FBI. Defendant Smith was not, and ultimately permitted to retire with full benefits.

62. On January 21, 2020, the DRB convened to consider Plaintiff's written appeal for reinstatement. The DRB decided to uphold Plaintiff's termination. The decision by the DRB to uphold the termination was based on their discriminatory treatment of Plaintiff based on her race, religion, sex, national origin, and reprisal. If the DRB thoroughly reviewed the merits of her case it would have examined the clear imbalance of power between a senior SAC and entry-level

junior employee, recognized that victims of sexual harassment and assault may have fragmented recollection due to unresolved trauma and that the investigative process applied to Plaintiff was unjustly initiated by Defendant Smith and resulted in an invasive inquisition.

63. The decision of the DRB was based upon discriminatory motive and was improperly influenced by Defendant Smith and his friends who were contributing false information to the OIG about the relationship. Defendant Smith and others in the field office conspired to influence the OIG investigation to cover up Defendant Smith's actions and assist him in his pursuit of Plaintiff.

64. It is the policy and practice of the FBI and its OIG to allow senior executives accused of sexual assault to quietly retire with full benefits without prosecution.

65. Because of the DRB's discriminatory and retaliatory actions, Defendant Smith was allowed to retire and earn his pension after engaging in a nonconsensual sexual relationship with a subordinate whom he imprisoned, tortured, harassed, blackmailed, stalked and manipulated, and instead removed Plaintiff, as the victim, from the roles of the FBI.

66. As a result of the discrimination and retaliation Plaintiff experienced, she has suffered and continues to suffer from trauma, fear, anxiety, and has been diagnosed with permanent injuries. She lost her position in the FBI and all sources of income. She has been unable to work following her dismissal from the FBI due to the trauma and fear that has persisted since the OIG investigation began and the constant pain of feeling mortified that the FBI, OPR, and DRB discriminated and retaliated against her. Plaintiff now lives in fear with irreparable harm and injuries, unable to continue to be a fixture in her community, as she once was.

67. Not only did the highest-level official of the FBI Field Office in her state use his position and power to abuse, harass, assault, manipulate, stalk, and control Plaintiff, the FBI covered up

the actions of Defendant Smith, instead, allowing Defendant Smith to remain with the FBI until

he was eligible to retire. Instead, the FBI pursued an investigation against Plaintiff, brought by

her sexual predator and harasser, which resulted in Plaintiff's termination from the FBI.

68. The FBI's OIG and the Director of the FBI were on notice of all of the facts set forth in

this complaint. The OIG covered up the allegations and the Director of the FBI has refused to

even respond to the facts of this case, which were brought to his personal attention.

69.  Defendant Smith's wrongful conduct that began while he was employed in the FBI

continued after his retirement by calling Plaintiff's family and friends to persuade her to continue

a relationship with him in order for her to not divulge information about what he had done during

the course of his control over her in an effort to keep his name clear. He continued to make

harassing calls from unknown numbers to Plaintiff causing her to continue to have to change her

number to get away from Defendant Smith.

70. The last wrongful act giving rise to liability in this action occurred in July 2020.

## CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF:
<u>VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964:
SEX DISCRIMINATION</u>
(AGAINST DEFENDANT BARR, FBI-Agency)

71. Plaintiff incorporates by reference the allegations of paragraphs 1-70 above.

72. The FBI intentionally discriminated against Plaintiff because of her sex race, national

origin, and religion when they failed to investigate her allegations, and terminated her from the

FBI to cover up the criminal actions of a Special Agent in Charge of a large field office.

73. This act violated Title VII of the Civil Rights Act of 1964, as amended.

74. Plaintiff has and will continue to suffer compensatory damages and damages for emotional distress, permanent PTSD, and deprivation of her civil rights as a result of the FBI's conduct.

SECOND CLAIM FOR RELIEF:
RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964
(AGAINST DEFENDANT BARR, FBI- Agency)

75. Plaintiff incorporates by reference the allegations of paragraphs 1-74 above.

76. The FBI retaliated against Plaintiff when she filed her initial EEO complaint, and through Defendant Smith, threatened her with physical harm if she used the EEO process. The FBI, through Defendant Smith, intentionally interfered with her protected rights under Title VII, while failing to investigate the facts, which were widely observed by others in that field office, and were further manipulated by Defendant Smith's ASAC in conspiracy with Defendant Smith.

77. Plaintiff has and will continue to suffer compensatory and special damages as a result of this illegal retaliation.

THIRD CLAIM FOR RELIEF:
CONSTITUTIONAL TORT FOR VIOLATION OF THE 4th AMENDMENT
Unlawful Search and Seizure- Warrantless Surveillance
(AGAINST DEFENDANT SMITH)

78. Plaintiff incorporates by reference the allegations of paragraphs 1-77 above.

79. At all times relevant hereto, Defendant Smith was a federal law enforcement officer with the FBI.

80. The actions of Defendant Smith in causing the interception of Plaintiff's communications, including her emails, text messages, and/or phone calls, without obtaining a warrant and without consent by Plaintiff, violated Plaintiff's clearly established constitutional rights against unlawful search and seizure and her right to privacy under the Fourth Amendment.

81. The actions of Defendant Smith in sexually assaulting and battering the Plaintiff further deprived Plaintiff of her constitutional rights under the Fourth Amendment.

82. The actions of Defendant Smith in searching law enforcement databases for, examining, retaining, and using Plaintiff's communications, including her emails, text messages, and/or phone calls, that were obtained without a warrant, and without notice to Plaintiff, violated Plaintiff's clearly established constitutional rights against unlawful search and seizure and her right to privacy under the Fourth Amendment.

83. Defendant Smith's unlawful search and seizure upon Plaintiff violated her constitutional rights and Plaintiff has and will continue to suffer significant emotional and economic damages as a result.

FOURTH CLAIM FOR RELIEF:
<u>CONSTITUTIONAL TORT FOR VIOLATION OF THE 5th AMENDMENT</u>
<u>Equal Protection and Due Process Violation</u>
<u>(AGAINST DEFENDANT SMITH)</u>

84. Plaintiff incorporates by reference the allegations of paragraphs 1-83 above.

85. At all times relevant hereto, Defendant Smith was a federal law enforcement officer with the FBI.

86. The actions of Defendant Smith violated Plaintiff's clearly established equal protection and due process rights under the Fifth Amendment.

87. Defendant Smith's investigation and initiation of an investigation with the Office of Inspector General was based on impermissible factors. The referral of Plaintiff to the DRB, ultimately resulting in her termination from the FBI denied her of her constitutional right to due process under the Fifth Amendment.

88. Furthermore, Defendant Smith orchestrated the investigation alongside other FBI officials, where the FBI interviewed Defendant Smith years before they spoke with Plaintiff and then allowed Defendant Smith to retire with a pension while removing Plaintiff from the FBI.

89. The actions of Defendant Smith in sexually assaulting and battering Plaintiff further deprived Plaintiff of her constitutional rights under the Fifth Amendment.

90. Defendant Smith's actions denied Plaintiff due process and violated her constitutional rights. As a result, Plaintiff has and will continue to suffer significant emotional and economic damages as a result.

FIFTH CLAIM FOR RELIEF:
DISCRIMINATION UNDER SECTION 1981
(AGAINST DEFENDANT SMITH)

91. Plaintiff incorporates by reference the allegations of paragraphs 1-90 above.

92. Defendant Smith has violated Section 1981 by subjecting Plaintiff to discrimination on the basis of race and ethnicity, by, inter alia, harassing, intimidating, and subjecting Plaintiff to unfounded investigations leading to the FBI ending Plaintiff's employment.

93. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages. Furthermore, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

94. Defendant Smith's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done

with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

SIXTH CLAIM FOR RELIEF:
<u>CIVIL BATTERY</u>
<u>(AGAINST DEFENDANT SMITH)</u>

95. Plaintiff incorporates by reference the allegations of paragraphs 1-94 above.

96. Defendant Smith intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff. He did so by, *inter alia:*

    a.      Isolating Plaintiff in closed quarters and dismissing any bystanders; and

    b.      Demanding or threatening sexual contact.

97. Defendant Smith did commit an unwanted contact with Plaintiff's person or property in a harmful or offensive manner, including but not limited to causing sexual contact between Defendant Smith and Plaintiff.

98. Defendant Smith's battery of Plaintiff caused harm, including physical, mental and/or emotional harm to Plaintiff.

99. Defendant Smith's conduct was committed within the scope of his employment unless committed in his individual capacity.

SEVENTH CLAIM FOR RELIEF:
<u>CIVIL ASSAULT</u>
<u>(AGAINST DEFENDANT SMITH)</u>

100.      Plaintiff incorporates by reference the allegations of paragraphs 1-99 above.

101.      Defendant Smith intended to cause apprehension of harmful or offensive conduct against Plaintiff. He did so by, *inter alia*:

    a.      Isolating Plaintiff in closed quarters and dismissing any bystanders;

    b.      Demanding or threatening sexual contact;

24

    c.      Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiff to fear that Defendant Smith had the ability to carry out his physical threats;

    d.      Threatening harm to Plaintiff's career and reputation if she did not comply with the solicited actions of Defendant Smith;

    e.      Sexual battery on Plaintiff.

102.      Defendant Smith's actions did, in fact, cause Plaintiff to fear and experience imminent harmful or offensive contact by Defendant Smith.

103.      Defendant Smith's conduct was committed within the scope of his employment, unless committed in his individual capacity.

EIGHTH CLAIM FOR RELIEF:
<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
<u>(AGAINST DEFENDANT SMITH)</u>

104.      Plaintiff incorporates by reference the allegations of paragraphs 1-103 above.

105.      Defendant Smith's extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

106.      Defendant Smith's outrageous conduct was not the type of ordinary rude or obnoxious behavior that a woman should be expected to weather. Rather, Defendant Smith's conduct exceeded all possible bounds of decency.

107.      Defendant Smith acted with intent or recklessness, knowing that the Plaintiff was likely to endure emotional distress. Indeed, he used this distress to subdue and threaten Plaintiff and prevent her from complaining or leaving his control based on his actions. He did these actions with deliberate disregard as to the high possibility that severe emotional distress would occur.

108.     Defendant Smith's conduct caused suffering for Plaintiff at levels that no reasonable person should have to endure.

109.     Defendant Smith's conduct was committed within the scope of his employment, unless committed in his individual capacity.

## NINTH CLAIM FOR RELIEF:
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST DEFENDANT SMITH)

110.     Plaintiff incorporates by reference the allegations of paragraphs 1-109 above.

111.     Defendant Smith's conduct negligently caused emotional distress to Plaintiff.

112.     Defendant Smith could reasonably foresee that his actions would have caused emotional distress to Plaintiff.

113.     Plaintiff was in a specific zone of danger being around Defendant Smith and at risk of physical and emotional harm, causing her fear.

114.     Plaintiff, immediately or shortly after being in the company of Defendant Smith, suffered distress and emotional harm.

115.     Defendant Smith's conduct was committed within the scope of his employment, unless committed in his individual capacity.

## TENTH CLAIM FOR RELIEF:
## FALSE IMPRISONMENT
## (AGAINST DEFENDANT SMITH)

116.     Plaintiff incorporates by reference the allegations of paragraphs 1-115 above.

117.     Defendant Smith's actions intended to confine Plaintiff within certain boundaries determined by him.

118.     Such actions by Defendant Smith directly and indirectly resulted in the confinement of the Plaintiff.

119.     Because of Defendant Smith's acts of confinement against Plaintiff, she was controlled on where she could go, told where to live, kept in a confined storage area, and was constantly monitored and followed by Defendant Smith.

120.     Plaintiff was consciously harmed by Defendant Smith's acts of confinement.

ELEVENTH CLAIM FOR RELIEF:
<u>TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS</u>
<u>(AGAINST DEFENDANT SMITH)</u>

121.     Plaintiff incorporates by reference the allegations of paragraphs 1-120 above.

122.     Beginning in 2011, Plaintiff maintained an employment contract with the FBI.

123.     Beginning in 2012, Defendant Smith was the highest-ranking FBI agent at the field office where Plaintiff worked and in the state that Plaintiff lived. He was her superior and top-rater on her annual performance evaluation until he moved to another state in 2013.

124.     In 2013, Defendant Smith began to intentionally interfere with Plaintiff's contractual relationship with the FBI by inciting a baseless investigation against her.

125.     As a result of Defendant Smith's intentional interference, Plaintiff was removed from her position at the FBI.

126.     Defendant Smith's interference with Plaintiff's contractual relationship with the FBI was improper as he had no proper foundation for referring Plaintiff to the Office of Inspector General.

127.     Through today, Plaintiff has been unable to work for the FBI or any other agency, as a result of Defendant Smith's actions, and such actions have caused immense emotional and economic harm to Plaintiff.

## EMOTIONAL AND OTHER HARM

128.    The conduct described above caused Plaintiff emotional and other forms of harm proximately caused by the FBI's discriminatory and retaliatory conduct and Defendant Smith's tortious conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

a.   An award of all damages that Plaintiff has sustained as a result of the Federal Bureau of Investigation's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits they would have received but for the discriminatory practices of the Federal Bureau of Investigation;

b.   Reinstatement of Plaintiff at the FBI;

c.   An award of compensatory damages for emotional distress that Plaintiff has sustained against the FBI in the amount of $1,000,000;

d.   An award of compensatory damages for emotional distress that Plaintiff has sustained against Defendant Smith in the amount of $10,000,000;

e.   An award of punitive damages for the intentional harm and damages Plaintiff has sustained against Defendant Smith in the amount of $50,000,000;

f.   Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

g.   Pre-Judgment and Post-Judgment interest, as provided by law; and

h.  Such other and further legal and equitable relief as this Court deems

necessary, just, and proper.


This the 9th day of December 2020.


Respectfully submitted,

*/s/* David J. Shaffer, Esq.
David J. Shaffer
D.C. Bar Number 413484

*/s/* Kelley Brooks Simoneaux, Esq.
Kelley Brooks Simoneaux
D.C. Bar Number 187844
Admission pending in D.C. District Court


David Shaffer Law, PLLC
5012 Aurora Drive
Kensington, Maryland 20895
Phone: 202-210-7424


David.Shaffer@davidshafferlaw.com
Kelley.Simoneaux@davidshafferlaw.com


*Attorneys for Plaintiff*

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all claims so triable.


This the 9th day of December 2020.


Respectfully submitted,



/s/ David J. Shaffer, Esq.
David J. Shaffer, D.C. Bar #413484

/s/ Kelley Brooks Simoneaux, Esq.
Kelley B. Simoneaux, D.C. Bar #187844

David Shaffer Law, PLLC
5012 Aurora Drive
Kensington, Maryland 20895
Phone: 202-210-7424
David.Shaffer@davidshafferlaw.com
Kelley.Simoneaux@davidshafferlaw.com